IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAURI A. JOHNSON, | ) | CASE NO. 1:23-CV-00977-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Lauri Johnson, ("Plaintiff" or "Johnson"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and VACATED AND REMANDED for further proceedings consistent with this opinion.

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

In June 2010, Johnson filed an application for POD, DIB, and SSI, alleging a disability onset date of April 13, 2009 and claiming she was disabled due to back pain, right leg pain, severe headaches, severe agitation, inability to stand more than ten minutes at a time, inability to drive three out of five days because of back pain, severe depression without wanting to harm herself or others, increased back pain with bending, inability to do minimal housework, severe anxiety, back problems, left leg pain, and depression.  (Transcript ("Tr.") 174, 1234.)  The applications were denied initially and upon reconsideration, and Johnson requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 11.)

On May 23, 2012, an ALJ held a hearing, during which Johnson, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 6, 2012, the ALJ issued a written decision finding Johnson was not disabled.  (*Id.* at 11-22.)  The ALJ's decision became final on January 15, 2014, when the Appeals Council declined further review.  (*Id.* at 1-6.)

Johnson filed a Complaint to challenge the Commissioner's decision.  (*Id.* at 1234.)  On March 17, 2015, the Court reversed and remanded the case back to the Commissioner for further administrative proceedings.  (*Id.*)

On December 31, 2014, Johnson filed an additional claim for POD and DIB.  (*Id.*)  On October 21, 2015, the state agency found Johnson disabled as of February 1, 2013, under the framework of Medical-Vocational Grid Rule 201.10.  (*Id.*)  The Appeals Council affirmed the state agency's determination.  (*Id.*)

On June 17, 2016, a new ALJ issued an unfavorable opinion regarding Johnson's concurrent application.  (*Id.*)  On January 30, 2017, the Appeals Council remanded the case, noting the ALJ had

adjudicated the wrong time period; as the Appeals Council had affirmed a finding of disability beginning February 1, 2013, the time period at issue on remand was April 13, 2009 through January 31, 2013.  (*Id.*)

On May 23, 2017, the ALJ issued another unfavorable decision.  (*Id.*)  On February 21, 2018, the Appeals Council again remanded the case, as the ALJ had issued the decision without offering Johnson another opportunity for a hearing, in contravention of the Appeals Council's order.  (*Id.*)

On October 25, 2018, a new ALJ issued an unfavorable decision regarding Johnson's concurrent claim.  (*Id.* at 1235.)  Johnson filed a Complaint to challenge the Commissioner's decision.  (*Id.*)  On March 31, 2021, the Court reversed and remanded the case back to the Commissioner for further administrative proceedings "as a result of an inadequate assessment of the opinion of treating source, psychiatrist Dr. Ahn."  (*Id.*)  On May 11, 2021, the Appeals Council remanded the case back to the ALJ.  (*Id.*)

On February 2, 2022, the ALJ held a hearing, during which Johnson, represented by counsel, and an impartial VE testified.  (*Id.*)  On February 23, 2022, the ALJ issued a written decision finding Johnson was not disabled.  (*Id.* at 1234-58.)  The ALJ's decision became final on March 16, 2023, when the Appeals Council declined further review.  (*Id.* at 1224-30.)

On May 15, 2023, Johnson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12-13.)  Johnson asserts the following issue on judicial review:

> (1)  Whether the administrative law judge failed to provide good reasons for the weight she gave to the opinion of Dr. Ahn where she erred in her analysis of controlling weight and failed to consider the regulatory factors in determining whether the opinion deserved significant weight?

(Doc. No. 10.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Johnson was born in April 1963 and was 46 years-old at the time of her alleged disability onset date (Tr. 1257), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a limited education.  (Tr. 1257.)  She has past relevant work as a nurse aid and clean up worker.  (*Id*. at 1256.)

### B.    Medical Evidence[2]

On March 26, 2010, Johnson saw Christy Sugarman, LPCC, LICDC, for a psychological evaluation as a result of possible mental health issues related to a work injury.  (*Id.* at 300, 303.)  Johnson experienced a lumbosacral sprain after being injured while helping a patient.  (*Id.* at 301.)  Johnson told Sugarman her injury and pain left her dependent on others for most of the activities she used to be able to complete without help.  (*Id.*)  Johnson reported she could no longer drive, grocery shop, cook, stand for long periods of time, help in her daughter's classroom, or attend school functions.  (*Id.*)  Johnson stated she used to be active with her daughter, but now needed help from her sister to care for her daughter.  (*Id.*)  Johnson endorsed tearfulness, feeling hopeless, difficulty going to sleep, difficulty staying asleep, and weight gain from inactivity.  (*Id.*)  Johnson told Sugarman her lack of income had caused financial difficulties for her family, and that she never wanted to rely on others to this degree.  (*Id.* at 301-02.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Johnson only challenges the ALJ's findings regarding her mental impairments, the Court further limits its discussion of the evidence to Johnson's mental impairments.

4

Johnson also endorsed an anxiety attack, as well as high levels of anxiety and depressive symptoms, including flat affect, hopelessness, tearfulness, sadness, low self-esteem, and disturbed sleep. (*Id.* at 302.)

On examination, Sugarman found Johnson appropriately dressed and well-groomed. (*Id.*) Sugarman noted Johnson appeared to not be able to stand upright, as she appeared bent over and walked very slowly. (*Id.*) Sugarman further noted it was apparent Johnson was in pain, as she had difficulty sitting and chose to sit on a wooden chair. (*Id.*) Sugarman found soft but appropriate speech, full orientation, logical and coherent thought process, flat affect, open demeanor, and no evidence of hallucinations or delusional thinking. (*Id.*) Sugarman administered the Minnesota Multifactor Personality Inventory-2-RF, and Johnson's scores were "consistent with many individuals with substantial medical problems, reporting credible symptoms," and "indicate[d] substantial emotional distress, with a risk for suicidal ideation." (*Id.*) Sugarman diagnosed Johnson with major depressive disorder, recurrent, severe, without psychotic features, and noted rule out a panic disorder and anxiety disorder. (*Id.*) Sugarman opined that because of Johnson's injury, as well as pain and associated economic issues related to Johnson being unable to work, Johnson had developed major depressive disorder, and there may be an additional diagnosis of an anxiety disorder. (*Id.* at 303.) Sugarman further opined that this diagnosis was a "direct result" of Johnson's injury, and the impact the injury had on Johnson's life and functional ability. (*Id.*) Sugarman recommended Johnson be evaluated by a psychiatrist for medication and undergo supportive counseling on a weekly or bi-weekly basis. (*Id.*)

On May 20, 2010, Johnson saw Richard Barnett, Ph.D., for a psychological evaluation at the request of Workers' Compensation. (*Id.* at 386-90.) Dr. Barnett noted Johnson arrived on time, had driven herself to her appointment, and came by herself. (*Id.* at 387.) While Johnson held a current

5

driver's license, she did not drive much.  (*Id.*)  Johnson reported her average mood was irritable and depressed, and she was often frustrated and disgusted.  (*Id.*)  Her sleep varied, but she woke up a lot and often slept in a chair because it was the only place she could get comfortable.  (*Id.* at 388.)  Johnson reported poor appetite but significant weight gain.  (*Id.*)  She told Dr. Barnett she could perform her own activities of daily living, but she did not do any housework; her sister helped with that.  (*Id.*)  Johnson reported preferring to be alone, as being around other people irritated her, and that she spent her day just sitting there.  (*Id.*)  The television might be on during the day, but she did not watch it.  (*Id.*)

On examination, Dr. Barnett found moderate hygiene and appropriate overall appearance.  (*Id.* at 387.)  Dr. Barnett further found Johnson verbal with some cooperation, lethargic approach, poor eye contact, a blunted affect, full orientation, no looseness of association or cognitive distortion, and no paranoid ideation.  (*Id.*)  While Johnson responded to questions, she "generally offered very little in terms of spontaneous verbalizations."  (*Id.*)  Johnson denied a history of hallucinations or delusions, and she also denied any suicidal ideation.  (*Id.*)  While Johnson reported taking pain medication, she could not remember the name of it.  (*Id.*)  Johnson recalled three out of three objects on immediate recall and two out of three after four to five minutes.  (*Id.*)  She struggled with serial sevens but completed serial fours with one error.  (*Id.*)  She could spell a five-letter word forward and backward with no errors.  (*Id.*)  She tried to list the months of the year in reverse order but stopped halfway through, telling Dr. Barnett she could not go any further.  (*Id.*)  Dr. Barnett administered the BDI II, and determined Johnson scored in the severe range.  (*Id.* at 388.)  Dr. Barnett diagnosed Johnson with major depression and opined that Johnson's mental condition appeared to be a direct and proximate result of her work injury.  (*Id.* at 388-89.)  Dr. Barnett recommended a psychiatric consult and individual psychotherapy.  (*Id.* at 389.)

From June 2010 to November 2011, Johnson saw Sugarman for individual counseling.  (*Id.* at 309-10, 553-57.)  In July 2010, Sugarman noted Johnson had limited concentration, and Johnson reported continued difficulty in participating in vocation rehab, as her physical limitations made it "impossible" for her to "remain seated in a heavily air conditioned room."  (*Id.* at 310, 553.)  On December 1, 2010, Sugarman noted Johnson continued to meet the DSM criteria for major depression, "including flat affect hopelessness, sleep disturbances, low frustration tolerance, isolating, inability to concentrate, depressed mood and anxiety."  (*Id.* at 555.)  On April 19, 2011, Sugarman noted Johnson seemed to have a bit more energy and facial expression.  (*Id.* at 556.)  In August 2011, Sugarman noted Johnson seemed to have more energy and facial expression, although she was still depressed.  (*Id.* at 557.)  During these sessions, Sugarman noted Johnson's continued difficulties being around other people, difficulties with anxiety and lack of concentration, and difficulties doing activities she used to enjoy, including reading, keeping house, attending family gatherings, and going to church.  (*Id.* at 309-10, 553-57.)  Sugarman opined Johnson's depression interfered with her concentration, and that upon stabilization with medication, Johnson should be able to return to work.  (*Id.* at 637-40.)  In November 2011, Johnson stopped going to sessions because the glassed-in elevator was not working, and Johnson's anxiety and claustrophobia prevented her from using the regular elevator.  (*Id.* at 557.)

In July 2010, Sugarman recommended Johnson's vocational rehabilitation be terminated, and the file was closed a result of the lack of counselor support.  (*Id.* at 625.)

In September 2010, Johnson began seeing psychiatrist Byong Ang, M.D.  (*Id.* at 444, 504, 506.)  At her initial evaluation, Johnson reported claustrophobic symptoms, anxiety and panic-like symptoms, poor sleep, weight gain, feelings of unhappiness, getting irritated easily, and mood swings.  (*Id.* at 504.)

7

Her husband and her sister helped her because of her back pain.  (*Id.* at 505.)  Dr. Ahn noted Johnson was "very irritable and cynical," although she denied suicidal attempts and severe mood swings.  (*Id.*)  Johnson told Dr. Ahn she did not care about what was happening and the thought of dying did not bother her.  (*Id.*)  Johnson felt she needed to return to work, and she wanted to go back to work.  (*Id.* at 504-05.)

On examination, Dr. Ahn found Johnson alert and angry with "generally coherent and relevant" speech, a somewhat irritable and mildly depressed mood, no delusions, paranoid ideations, or hallucinations, no homicidal thoughts, moderate insight, and fair judgment.  (*Id.* at 506.)  Dr. Ahn noted Johnson's cognitive function did not seem to be impaired.  (*Id.*)  Dr. Ahn diagnosed Johnson with major depression, possible recurrent type, and noted she probably also suffered from bipolar affective disorder, type II.  (*Id.*)  Dr. Ahn prescribed Zonegram and Zoloft.  (*Id.*)

Johnson saw Dr. Ahn several more times between October 2010 and March 2012.  (*Id.* at 367, 369, 385, 497-503, 559, 578.)  Dr. Ahn tried several additional mood stabilizers and anti-depressants, including Depakote, Stavzor, Elavil, Lithium, and Lamictal, to try to stabilize Johnson's mood.  (*Id.*)  At the treatment sessions, Dr. Ahn noted Johnson's reported continuing irritability, anger problems, mood swings, sleep problems, and pain.  (*Id.*)  In November 2010, Johnson felt she was "doing a little bit better," although her irritability had not improved and she felt "a little depressed."  (*Id.* at 502.)  In December 2010, Dr. Ahn noted that Johnson's depression and irritability appeared to be due to her pain problem.  (*Id.* at 501.)  In February 2011, Johnson told Dr. Ahn she had felt a little better since her Zoloft had increased; however, she had spent Christmas alone, as she stayed home while her husband and daughter went to parties, and no one came to her house.  (*Id.* at 500.)  In October 2011, Johnson reported that her irritability was negatively affecting her marriage.  (*Id.* at 497.)

8

On June 9, 2011, Johnson saw Thomas Evans, Ph.D., for a consultative psychological evaluation. (*Id.* at 332-36.)  Johnson's brother drove her to the evaluation.  (*Id.* at 332.)  Johnson told Dr. Evans her back and her depression were why she was disabled, and she reported taking Lithium, Elavil, Zoloft, and Roxicet for her mental health conditions.  (*Id.* at 333.)  She stated that when she was working, she got along well with other people in general, she had no problems getting along with authority figures at work, and she responded to work stressors well.  (*Id.*)  In the past year, she had two good days out of seven and was unable to rate her depression on a scale of 1-10.  (*Id.* at 334.)  Johnson endorsed depressed mood, fatigue, lack of motivation, low self-esteem, feeling helpless, crying episodes, frequent irritability, and lack of energy.  (*Id.*)  She held a driver's license but could not drive.  (*Id.*)  Johnson, her husband, and her sisters did the cleaning, cooking, and laundry.  (*Id.*)  Johnson's husband and her sister did the grocery shopping.  (*Id.*)  She spent her day sitting around the house because of her pain and going to appointments. (*Id.*)

On examination, Dr. Evans found good grooming and hygiene, normal speech, good eye contact, normal thought content, full orientation, adequate insight, and adequate social judgment.  (*Id.* at 334-35.)  Johnson could spell world forward and backward, she knew the current and past president, she could recall three out of three words after a five-minute delay, she could recite six digits forward and five backward, and she counted backwards from 20 to 1 by three with two errors.  (*Id.* at 335.)  Dr. Evans noted Johnson "was cooperative and friendly throughout the entire interview, and a rapport was easily established and maintained."  (*Id.*)  Dr. Evans opined that, based on the evaluation, there was no indication Johnson would have difficulty understanding, remembering, and carrying out simple instructions, maintaining concentration, persistence, and pace for multistep tasks, and responding appropriately to

9

supervision and coworkers.  (*Id.* at 335-36.)  Dr. Evans opined that Johnson's psychiatric symptoms, including irritability, low motivation, and fatigue, "may impact her ability to respond appropriately to work pressures." (*Id.* at 336.)  Dr. Evans diagnosed Johnson with dysthymic disorder. (*Id.*)

On October 25, 2011, Sugarman completed a mental status questionnaire.  (*Id.* at 509-11.)  In response to the question asking for a description of Johnson's mental status, Sugarman identified flat affect, depressed mood, negative thinking, isolating behavior, panic attacks in groups, including sweating, shaking, shortness of breath, rapid heart rate, and needing to leave, impaired concentration and short-term memory, and normal insight and judgment.  (*Id.* at 509.)  In response to questioning regarding Johnson's ability to remember, understand, and follow directions, maintain attention, and sustain concentration, persist at tasks, and complete tasks in a timely fashion, Sugarman identified short-term memory impairment and focus and concentration compromised.  (*Id.* at 510.)  Sugarman identified deficiencies in social interaction consisting of high anxiety and panic attacks in social settings.  (*Id.*)

That same day, Sugarman completed a daily activities questionnaire.  (*Id.* at 512-13.)  Sugarman described limited interaction with others due to depression.  (*Id.* at 512.)  Johnson had "very limited" visits with friends and visited her family every one to two weeks.  (*Id.*)  Sugarman listed the symptoms preventing work activities for a usual workday or work week as depressed mood, limited interaction with others, low frustration tolerance, sleep disturbances, and inability to concentrate.  (*Id.*)  Sugarman reported Johnson's ability to complete household chores was reportedly limited because of her pain, fatigue, and depression and her ability to shop was limited as Johnson had frequent panic attacks in public.  (*Id.* at 513.)  Johnson preferred not to drive herself because of her panic attacks and anxiety.  (*Id.*)  Johnson reported she did not engage in hobbies as she had no interest and could not concentrate.  (*Id.*)

10

In January 2012, Dr. Ahn determined that Johnson "should be able to try voc[ational] rehab[ilitation] at this time. She has better insight but symptoms continue to interfere daily." (*Id.* at 643.) Dr. Ahn stated that Johnson had "continued fluctuation of symptoms of depression: anhedonia, irritability, mood swings, persistent back and leg pain, claustrophobia," and that she would be "unable to function for some part of each day due to persistent pain issues." (*Id.*) Dr. Ahn further noted that Johnson "[r]emains easily frustrated and mildly paranoid." (*Id.*)

On March 1, 2012, Johnson saw Paula Campbell, MSW, LISW, for an initial counseling appointment. (*Id.* at 570, 574.) Johnson reported being frustrated that she was unable to care for herself. (*Id.*) Johnson told Campbell she was very irritable, she could not maintain concentration and focus, and felt useless at times. (*Id.* at 570.) On examination, Campbell found good hygiene, guarded attitude, depressed, pessimistic, and irritable mood, appropriate affect, logical and coherent thought process, normal attention/concentration, good insight and judgment, and normal speech. (*Id.* at 572.) Campbell diagnosed Johnson with adjustment disorder with depression and anxiety and major depression – r/o recurrent. (*Id.* at 573.) Johnson's goal was to decrease her anger and depression. (*Id.*) Johnson continued to see Campbell for counseling throughout March and April 2012. (*Id.* at 567-74.)

On April 26, 2012, Dr. Ahn completed a medical source statement concerning the nature and severity of Johnson's mental impairments. (*Id.* at 577-78.) Dr. Ahn opined Johnson had marked limitations in her abilities to maintain attention and concentration for two-hour periods of time, perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, and interact appropriately with others. (*Id.* at 577.) Dr. Ahn stated that Johnson's medications had been "consistently" changed and adjusted because her "mood ha[d] not stabilized for any consistent amount of

11

time." (*Id.*) Dr. Ahn further stated that Johnson's "[l]evel of depression appears to be affected by her experience of being in constant pain," "[s]he is consistently unable to sleep well," and "her focus and ability to concentrate have decreased while irritability has increased." (*Id.* at 578.) Johnson's diagnosis consisted of major depression, possible recurrent type. (*Id.*)

At the administrative hearing in 2012, Johnson testified that during her appointments with Dr. Ahn, he would ask her about her feelings and emotions, and they had very detailed discussions about how she felt. (*Id.* at 68.)

**C.    State Agency Reports**

On July 20, 2011, William Nordbrock, Ph.D., reviewed the file and opined that Johnson had no severe mental impairments. (*Id.* at 339.)

On November 1, 2011, Carl Tishler, Ph.D., reviewed the file and determined Johnson had moderate limitations in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (*Id.* at 526-28.) Dr. Tishler opined that Johnson was capable of one to two step tasks in a stable environment with limited social interaction. (*Id.* at 528.)

12

In connection with the subsequent application, which concerned the period of September 7, 2012 through June 30, 2014 (*id.* at 929), Vicki Warren, Ph.D., found insufficient evidence to evaluate the severity of Johnson's mental impairments.  (*Id.* at 930-31.)  Dr. Warren noted there were no mental health records in the file for 2012 to 2014.  (*Id.* at 931.)  Dr. Warren reviewed Dr. Ahn's April 2012 opinion and determined it was "without substantial support from other evidence of record, which renders it less persuasive."  (*Id.* at 934-35).

### D.    Hearing Testimony

During the February 2, 2022 hearing, Johnson testified to the following:

- She was living with her husband, daughter, and dog during the relevant time period of April 2009 to the end of January 2013.  (*Id.* at 1453, 1455.)

- Her physical impairments from a work injury caused mental impairments.  (*Id.* at 1457.)  She has worked all her life, so for someone to sit with her while she stayed in her house was "nerve wracking."  (*Id.*)  She could not go anywhere, she could not drive, and she could not go to church.  (*Id.*)  It bothered her that she could not work.  (*Id.*)

- Her mental health issues affected her by making her angry, and she could not focus, she could not read, and she could not tell someone what she was watching on TV.  (*Id.*)  She was mad and angry that she could not work, and she had to have a seven-year-old and someone else watch her.  (*Id.*)

- She went to a psychiatrist for treatment of her mental health issues.  (*Id.*)  She also saw a counselor.  (*Id.*)  They would talk about how she was feeling and why she was angry.  (*Id.* at 1459.)  She was on medication, but she could not remember what she was taking.  (*Id.*)  She was given many different medications for her mental health.  (*Id.* at 1465.)

- She could not do much around the house, so her sister helped.  (*Id.* at 1461.)  Her husband raised their daughter.  (*Id.*)  Her husband and sister did the shopping, the cooking, and the laundry.  (*Id.*)  She did not do any chores.  (*Id.*)  She tried folding laundry, but it did not work.  (*Id.*)  She could bathe and dress herself.  (*Id.* at 1462.)

13

She spent her days sitting in a chair and looking out the window. (*Id.*) Her sister took care of her daughter during the day. (*Id.*)

The ALJ read Johnson's past work as a nurse aid and clean up worker into the record. (*Id.* at 1454.) The ALJ posed the following hypothetical question:

> I'm going to ask you to please assume individual of those ages – the claimant's ages, education, and work experience. And if you can please assume that this hypothetical individual can lift and carry, push and pull occasionally 20 pounds, frequently 10 pounds; stand and/or walk for two hours out of an eight-hour workday, of course; sit for six hours; never climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl. This individual is limited to perform simple, routine tasks; have occasional interactions with supervisors, coworkers, and the public; and is limited to routine workplace changes. With these limitations, can you please advise, would such an individual be able to perform claimant's past work?

(*Id.* at 1466-67.)

The VE testified the hypothetical individual would not be able to perform Johnson's past work as a nurse aide and clean up worker. (*Id.* at 1467.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as document preparer, cutter and paster, and addresser. (*Id.*) In response to questioning from Johnson's counsel, the VE testified that in order to perform the representative jobs, the worker must be able to interact appropriately with supervisors and coworkers. (*Id.* at 1469.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

14

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20

15

C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Johnson was insured on her alleged disability onset date, April 13, 2009, and remains insured through June 30, 2014, her date last insured ("DLI"). (Tr. 1234-35.)  Therefore, in order to be entitled to POD and DIB, Johnson must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2.      The claimant did not engage in substantial gainful activity from April 13, 2009, the alleged onset date, through January 31, 2013 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant had the following severe impairments during the period at issue: obesity, degenerative disc disease of the lumbar spine with radiculopathy and spondylolisthesis of L4 on L5, major depressive disorder, dysthymic disorder, anxiety disorder, bipolar disorder, and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      During the period at issue, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

16

5.    After careful consideration of the entire record, I find that from April 13, 2009 through January 31, 2013, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except she could lift and carry/push and pull occasionally 20 pounds and frequently 10 pounds, could stand and/or walk for 2 hours out of an 8-hour workday, could sit for 6 hours out of an 8-hour workday; could never climb ladders, ropes, or scaffolds; could frequently stoop, kneel, crouch, and crawl; limited to performing simple, routine tasks; have occasional interactions with supervisors, coworkers, and the public; and was limited to routine workplace changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April **, 1963 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education (20 CFR 404.1564 and 416.964.)

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant was not under a disability, as defined in the Social Security Act, from April 13, 2009 through January 31, 2013 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1237-58.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is

17

supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole assignment of error, Johnson argues that the ALJ "again failed to follow the treating physician rule." (Doc. No. 10 at 16.) Johnson asserts the ALJ erred in failing to give Dr. Ahn's opinion controlling weight, and further erred in failing to provide good reasons for the weight assigned to Dr. Ahn's opinion. (*Id.* at 16, 23.)

Johnson argues that the ALJ's controlling weight analysis "falls short," as the ALJ "provides no rationale" as to how findings of alertness, normal speech, intact cognitive function, moderate insight, and

no suicidal or homicidal ideation "undermine Dr. Ahn's opinion." (*Id.* at 19.) Johnson maintains that "as before, the ALJ appears to mistake the waxing and waning of symptoms as evidence that Dr. Ahn's opinion was somehow unsupported and inconsistent with the record as a whole," which this Court previously rejected. (*Id.* at 20.) In addition, "the ALJ's simple recitation of findings without a context glosses over the fact that other sources found significant findings and limitations." (*Id.*) Johnson argues the ALJ never analyzed whether the opinions of Dr. Barnett and counselor Sugarman were consistent with the opinion of Dr. Ahn. (*Id.* at 21.) While the ALJ did "not directly address" Johnson's activities of daily living in the context of evaluating Dr. Ahn's opinion, as the ALJ did in the previous opinion, the ALJ did use those activities to find Johnson was not as limited as alleged, and this Court "previously found such reliance on daily activities misplaced." (*Id.* at 22.) In addition, as before, the ALJ ignored Johnson's ability to sustain those activities. (*Id.* at 23.)

Johnson also argues that the ALJ erred as she "never mention[ed] the factors that must be addressed in determining whether a treating source opinion still deserves significant weight" and failed to give good reasons for the weight assigned to Dr. Ahn's opinion. (*Id.* at 24-25.)

The Commissioner responds that the ALJ "reasonably explained" why she assigned little weight to Dr. Ahn's opinions. (Doc. No. 12 at 9.) The Commissioner argues that Johnson "seeks to impose on this decision the deficiencies of the prior decision"; while "[t]he prior decision was remanded because the ALJ relied on activities of daily living to discount Dr. Ahn's opinion," here, while the ALJ considered Johnson's activities of daily living, it was in the context of the subjective symptom evaluation and not part of the evaluation of opinion evidence. (*Id.* at 12.) In addition, while Johnson argues that other evidence is consistent with Dr. Ahn's opinion, that is "'immaterial'" so long as substantial evidence supports the

20

ALJ's decision.  (*Id.* at 13) (citation omitted).  Finally, an ALJ is not required to provide an "'exhaustive factor-by-factor analysis'" in determining what weight to assign to a treating source opinion.  (*Id.*) (citation omitted).

In reply, Johnson argues that "the fact that the ALJ relied on activities of daily living in evaluating Dr. Ahn's opinion was not the problem."  (Doc. No. 13 at 4.)  "The problem was that the ALJ used activities of daily living without considering the Plaintiff's ability to sustain such activities."  (*Id.*)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[4]  *See also Gayheart*, 710 F.3d at 376 ("If the

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).   The claims at issue in this case were filed in June 2010. (Tr. 1234.)

[4] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the

22

"treating physician rule" only applies to medical opinions.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 F. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 F. App'x 464, 471 (6th Cir. 2014).

The ALJ weighed and analyzed Dr. Ahn's opinions as follows:

> The record contains several opinions rendered by treating psychiatrist Byong Ahn, M.D. On April 26, 2021, Dr. Ahn opined the claimant experiences marked limitations regarding her ability to maintain attention and concentration for 2 hour periods, perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, and interact appropriately with others (Exhibit 23F). In support of his opinion, Dr. Ahn noted a diagnosis of major depression, possible recurrent and GAF score of 50 (*Id.*). Dr. Ahn noted the claimant's medications have been changed and adjusted consistently because her mood has not stabilized for any consistent amount of time, and he noted the claimant's level of depression appears to be affected by her experience of being in constant pain (*Id.*). Dr. Ahn noted the claimant is consistently unable to sleep well, and her focus and ability to concentrate have been decreased while irritability has increased (*Id.*). Although somewhat supported by the diagnosis, symptoms, and treatment noted therein, the opinion is inadequately supported by Dr. Ahn's own treatment notes, which contain evidence of a somewhat irritable, mildly depressed mood, restricted affect, angry demeanor, and only fair judgment, but normal alertness, thoughts, and speech, intact cognitive function, moderate insight, and no suicidal or homicidal ideation on mental status examination (Exhibit 12F, 20F). Furthermore, while Dr. Ahn's treatment notes confirm frequent medication adjustments due to persistent mood symptoms, the treatment notes are relatively sparse, containing only occasional references to mental status examination findings (*Id.*). In addition, Dr. Ahn's opinion is inconsistent with the remaining evidence of record, specifically findings of normal alertness and orientation, consistently normal speech and thoughts, intact attention and concentration, intact cognition, average estimated intelligence, and adequate to good insight (Exhibit 2F, 7F, 10F, 22F). Thus, Dr. Ahn's opinion does not warrant controlling weight. Rather,

23

the opinion warrants little weight, as the record as a whole indicates moderate, as opposed to marked, limitations caused by mental impairment. More specifically, examination findings of overt pain, anger, guarded demeanor, consistently abnormal mood and affect, occasionally decreased attention and concentration, occasionally soft speech, and fair judgment, but normal alertness and orientation, appropriate dress, good hygiene and grooming, otherwise normal speech, consistently normal thoughts, intact cognitive function and memory, average estimated intelligence, adequate to good insight, and no suicidal or homicidal ideation on examination, confirms the claimant is not as restricted as indicated by Dr. Ahn (Exhibit 2F, 3F, 7F, 10F, 12F, 19F, 20F, 22F). As a result, his opinion warrants little weight.

Dr. Ahn opined on January 19, 2012 that the claimant is unable to return to home health care work, and was disabled from September 9, 2010 through May 6, 2012, with an estimated return to work of May 7, 2012 (Exhibit 33F/3). In support of his opinion, Dr. Ahn noted the claimant is unable to function for some part of each day due to persistent pain issues, and remains easily frustrated and mildly paranoid (*Id.*). As noted above, the determination of whether a claimant can return to past work, and/or is disabled, are issues reserved to the Commissioner of Social Security, and therefore I give these findings little weight. The remainder of the opinion warrants little, as opposed to great or controlling weight. In so finding, I note that while somewhat supported by narrative discussion of the claimant's reported symptoms, including persistent pain, easy frustration, and mild paranoia, discussed therein, the opinions are inadequately supported by Dr. Ahn's own treatment notes, which contain findings of normal alertness, speech, and thoughts, intact cognitive function, moderate insight, and no suicidal or homicidal ideation on the limited mental status examinations noted therein (Exhibit 12F, 20F). In addition, the opinions are inconsistent with the remaining evidence of record, which contains mental status examination findings of overt pain, soft speech, occasionally lethargic presentation, occasionally decreased eye contact, abnormal mood and affect, and occasionally decreased attention/concentration, but normal alertness and orientation, good hygiene and grooming, otherwise normal speech, consistently normal thoughts, with no evidence of paranoia or psychosis, intact memory, average estimated intelligence, adequate to good insight, and no suicidal or homicidal ideation on examination (Exhibit 2F, 3F, 7F, 10F, 19F, 22F). These findings contradict Dr. Ahn's opinion, and therefore I give it little weight.

Dr. Ahn rendered another opinion on September 20, 2010, wherein he noted the claimant was disabled from September 9, 2010 through April 10, 2011, with an estimated return to work on April 11, 2011, once the claimant's depressive

symptoms have become stabilized (Exhibit 33F/4). Notably, Dr. Ahn indicated the claimant had only just started treatment under his care (*Id.*). As noted above, the determination of whether an individual is disabled is reserved to the Commissioner of Social Security, and therefore cannot be given controlling weight. Furthermore, this opinion is inadequately supported by Dr. Ahn's own treatment notes, which contain findings of normal alertness, speech, and thoughts, intact cognitive function, moderate insight, and no suicidal or homicidal ideation on the limited mental status examinations noted therein (Exhibit 12F, 20F). Additionally, the opinion is inconsistent with the remaining evidence of record, which contains mental status examination findings of overt pain, soft speech, occasionally lethargic presentation, occasionally decreased eye contact, abnormal mood and affect, and occasionally decreased attention/concentration, but normal alertness and orientation, good hygiene and grooming, otherwise normal speech, consistently normal thoughts, with no evidence of paranoia or psychosis, intact memory, average estimated intelligence, adequate to good insight, and no suicidal or homicidal ideation on examination (Exhibit 2F, 3F, 7F, 10F, 19F, 22F). For these reasons, I give Dr. Ahn's September 20, 2010 opinion little weight.

(Tr. 1251-52.)

As discussed *supra*, the ALJ must give a treating source opinion controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2). The ALJ found Dr. Ahn's opinion to be unsupported by his treatment records and inconsistent with other evidence in the record, and therefore it was not entitled to controlling weight. When giving less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486

25

F.3d at 242. Here, the ALJ has met that burden.[5] She clearly stated the weight given to the opinion and cited specific evidence in explaining her reasoning. The ALJ noted, and Johnson does not dispute, that the evidence in Dr. Ahn's treatment records was mixed. (Tr. 1251-52.) In addition, the ALJ further noted, and again Johnson does not dispute, that Dr. Ahn's treatment notes were "relatively sparse," with "only occasional references to mental status examination findings." (*Id.* at 1251.) The Court disagrees with Johnson that the contrary evidence cited by the ALJ, including findings of normal alertness and concentration, normal speech and thoughts, intact attention, concentration, and cognition, average intelligence, and adequate to good insight, do not undercut Dr. Ahn's opinion that Johnson had marked limitations in her ability to maintain attention and concentration for two-hour periods, perform work activities at a reasonable pace, keep a regular work schedule, and maintain punctual attendance. While these findings may not necessarily undercut Dr. Ahn's opinion that Johnson had a marked limitation in her ability to interact appropriately with others, the ALJ identified other good reasons ("relatively sparse" treatment notes with "only occasional references to mental status examination findings") to assign little weight to Dr. Ahn's opinion. Therefore, the ALJ did not err in her treatment of this opinion.

Although couched in her assignment of error regarding the treating source rule,[6] Johnson raises an argument regarding the ALJ's credibility analysis. Johnson argues that while the ALJ did "not directly address" Johnson's activities of daily living in the context of evaluating Dr. Ahn's opinion, as the ALJ did

---

[5] "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ...give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. Mar. 16, 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).

[6] The Court cautions counsel to take care not to lump various challenges to the ALJ's decision together. Counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper.

26

in the previous opinion, the ALJ did use those activities to find Johnson was not as limited as alleged, and this Court "previously found such reliance on daily activities misplaced."  (Doc. No. 10 at 22.)   In addition, as before, the ALJ ignored Johnson's ability to sustain those activities.  (*Id.* at 23.)

The Commissioner argues that Johnson "seeks to impose on this decision the deficiencies of the prior decision"; while "[t]he prior decision was remanded because the ALJ relied on activities of daily living to discount Dr. Ahn's opinion," here, while the ALJ considered Johnson's activities of daily living, it was in the context of the subjective symptom evaluation and not part of the evaluation of opinion evidence.  (*Id.* at 12.)

In reply, Johnson argues that "the fact that the ALJ relied on activities of daily living in evaluating Dr. Ahn's opinion was not the problem."  (Doc. No. 13 at 4.)   "The problem was that the ALJ used activities of daily living without considering the Plaintiff's ability to sustain such activities."  (*Id.*)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[7] 2016 WL 1119029 (March 16, 2016).

_____

[7] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the February 2, 2022 hearing.  Social Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017) ("When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the

If these claims are not substantiated by the medical record, the ALJ must make a credibility[8]

determination of the individual's statements based on the entire case record. Credibility determinations

regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human*

*Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir.

2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The

ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See*

*Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's

"decision must contain specific reasons for the weight given to the individual's symptoms ... and be

clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated

the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ

rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ

must look to medical evidence, statements by the claimant, other information provided by medical

sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL

1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should

---

final decision using the rules that were in effect at the time we issued the decision under review. If a court
remands a claim for further proceedings after the applicable date of the ruling (March 28, 2016), we will
apply SSR 16-3p to the entire period in the decision we make after the court's remand.")

[8] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to
consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms,"
and "evaluate whether the statements are consistent with objective medical evidence and other evidence."
SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely
eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an
examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th
Cir. 2016).

consider.[9]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

      As part of the RFC analysis and the subjective symptom evaluation, the ALJ found as follows:

> In addition to the objective medical evidence, I have also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of her severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment during the period at issue. However, these factors do not show that the claimant was more limited than determined when setting forth the above residual functional capacity.

> The claimant's activities of daily living during the period at issue detract from her allegations of totally debilitating impairment, and instead support the foregoing residual functional capacity. The claimant has indicated relatively limited activities during the period at issue, as she did not drive or engage in social activities, she could no longer attend school functions or help in her daughter's classroom, and she reportedly received assistance from family members with cooking, cleaning, and laundry (Exhibit 4E, 2F, 7F, Hearing Testimony). In March 2010, the claimant indicated she is unable to grocery shop, cook, or stand for long periods of time, and in June 2011, she indicated she basically sits around the house all day (Exhibit 2F, 7F). However, the claimant was admittedly able to make coffee, do the dishes, walk to her sister's home, prepare simple meals, like sandwiches, soups, noodles, and frozen dinners, walk to her sister's home, babysit and cook for her niece, attend appointments, go out alone, shop in stores with help from her husband, count

---

[9] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

change, read, watch television, care for a pet dog, and care for her young daughter with some assistance from family members (Exhibit 4E, 2F, 7F, Hearing testimony). In sum, the claimant's activities, while perhaps somewhat restricted, nevertheless confirm the claimant was not as physically or mentally limited as alleged during the period at issue.

In assessing the claimant's allegations, I have also considered the scope of treatment. . . .

The behavioral health record is likewise limited and conservative. The claimant underwent individual counseling/therapy with Christy Sugarman, LPCC, from March 2010 through November 2011, as well as medication management with psychiatrist Byong Ahn, M.D., from September 2010 through January 2012 (Exhibit 2F, 3F, 12F, 19F, 20F). The record also contains evidence of very limited counseling with Paula Campbell, LISW, during March and April 2012 (Exhibit 22F). The claimant remained symptomatic, demonstrating persistent mental status abnormalities on examination, resulting in a need for frequent medication adjustments (Exhibit 2F, 3F, 7F, 10F, 12F, 19F, 20F, 22F). However, the claimant did not seek more extensive mental health treatment, such as case management services, counseling/therapy with a psychologist, or participation in an intensive outpatient program or partial hospitalization program (*Id*.). Furthermore, the claimant did not require emergency hospitalization or inpatient psychiatric treatment at any time (*Id*.). This indicates the claimant's mental impairments, while severe, were manageable with limited, conservative behavioral health treatment.

(Tr. 1247-48.)

First, the ALJ mischaracterizes Johnson's self-reports, as Johnson explained her husband helped her babysit her niece, as well as cook, clean, do laundry, and shop. (*Id.* at 189.)  Her husband and her family helped her with indoor and outdoor chores. (*Id.* at 190.)  She could do "some light dusting and [a] few dishes." (*Id.*)  While she "[o]ccasionally" shopped with her husband, she "often sat in [her] car and [her] husband [went] inside." (*Id.* at 191.)  In addition, another individual, Jacqueline White, completed the form for Johnson; she asked Johnson the questions and wrote down her answers. (*Id.* at 195.)  At her February 2, 2022 hearing, Johnson testified that all she did was get dressed, sit in a chair, and look out the

30

window (*id.* at 1462); her husband raised their daughter, and her husband and sister did the cooking, shopping, and laundry. (*Id.* at 1461.) She did not do any chores. (*Id.*)

Second, the Sixth Circuit has a long history of rejecting conclusions that individuals who "can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping" are therefore not suffering from limitations that prevent engaging in "substantial gainful activity," as such simple tasks are "intermittent and not continuous" and may be done in spite of otherwise disabling limitations. *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967). *Accord Miller*, 811 F.3d 838 ("Although the ALJ may properly consider Miller's household and social activities when 'evaluating a claimant's assertions of pain or ailments,' the ALJ must establish that Miller could have performed such activities on a '*sustained basis*' when assessing Miller's mental impairments.") (emphasis in original, internal citations to *Keeton v. Comm'r of Soc. Sec.*, 538 F. App'x 515 (6th Cir. 2014), *Walkers v. Comm'r Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997), and *Gayheart*, 710 F.3d 365, omitted). Here, the ALJ failed to establish Johnson could have performed her activities of daily living on a sustained basis in assessing her mental impairments.

Third, while the ALJ's determination that Johnson's severe mental impairments "were manageable with limited, conservative behavioral health treatment" is correct in the sense that she did not require more extensive mental health treatment such as hospitalizations or an intensive outpatient program, as set forth above, the ALJ mischaracterized Johnson's activities of daily living and failed to establish she could perform such activities on a sustained basis. It is unclear to the Court on judicial review the extent to which the ALJ's erroneous determination regarding Johnson's activities of daily living impacted the ALJ's determination regarding Johnson's mental health treatment and the management of her symptoms.

In addition, treatment providers recommended psychiatric medication management and individual counseling to manage her severe depression (Tr. 303), and Johnson complied with that treatment.  While it is a close call, in this case, the Court finds it must determine that, without more, the conservative nature of Johnson's mental health treatment is not enough to uphold the ALJ's subjective symptom evaluation.[10]

As the Sixth Circuit has noted, "while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011).  Here, the ALJ's reasons for discrediting Johnson's allegations of disabling symptoms are not supported by substantial evidence.  Accordingly, remand is required to allow the ALJ an opportunity to conduct a proper subjective symptom analysis.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: January 19, 2024

    *s/ Jonathan Greenberg*
    Jonathan D. Greenberg
    United States Magistrate Judge

---

[10] The Court is also troubled by the ALJ's questioning during the February 2, 2022 hearing regarding Johnson's current mental health conditions and functioning (Tr. 1462-63) and the ALJ stating, "Well it's just – you're not even getting counseling, and you're improved now" (*id.* at 1463), despite the period at issue being April 13, 2009 through January 31, 2013.  (*Id.* at 1235.)

32

## **<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).